In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3655

TATSIANA BOIKA and SERGEY ZHITS,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney
General of the United States,

*Respondent.*

Petition for Review of
an Order of the Board of Immigration Appeals.
Nos. A088-223-087 and A088-223-088.

ARGUED SEPTEMBER 27, 2012 — DECIDED AUGUST 16, 2013

Before RIPPLE, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Tatsiana Boika, a Belarusian citizen, entered the United States legally in May 2006 but overstayed her authorized stay. At her removal proceedings, she conceded removability but applied for asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief pursuant to the Convention Against Torture. Boika's husband, Sergey Zhits, also made parallel claims. His claims are derivative from Boika's claims based on

their marital status under 8 U.S.C. § 1158(b)(3)(A), so we do not address his claims separately.

Based on past persecution for her political involvement in Belarus, principally between 2004 and 2006, Boika claimed that she could establish a well-founded fear of future persecution upon return to Belarus. An immigration judge (IJ) denied her asylum application due in large part to an adverse credibility finding after two hearings in which Boika could not satisfactorily explain inconsistencies in her testimony and corroborating documents. The Board of Immigration Appeals affirmed the IJ's denial of asylum, and we denied Boika's subsequent petition for review. *Boika v. Holder*, 418 Fed. App'x. 559 (7th Cir. 2011).

Boika then moved to reopen based on materially changed country conditions. See 8 U.S.C. § 1229a(c)(7)(C)(ii). Boika asserted that after Belarusian President Alexander Lukashenko's election in 2010, the Belarusian government's severe crackdown on political opposition had resulted in widespread human rights abuses. These abuses were serious enough that the United States and the European Union imposed new sanctions on the Belarusian government in February 2011. Boika also submitted new corroborating evidence that she has been active in the Belarusian opposition movement while she has been in the United States.

The Board denied Boika's motion to reopen, explaining only that the evidence she offered did not reflect a material change in conditions in Belarus and was not sufficient to show a prima facie claim for eligibility for asylum. We grant Boika's and her husband's petition for review and remand to the Board

for further proceedings consistent with this opinion. The terse Board opinion did not provide an adequate explanation for rejecting Boika's new evidence and denying her motion to reopen. The prior credibility finding against Boika regarding her pre-2007 political opposition inside Belarus does not necessarily taint her new evidence concerning both her new political activity in the United States or the new, severe crackdown on the government's political opponents in Belarus. That evidence needs a fresh look.

I.  *Motions to Reopen*

Motions to reopen removal proceedings must be filed within 90 days of the final order, subject to several exceptions. 8 U.S.C. § 1229a(c)(7)(C)(i). Boika filed her motion to reopen long after the 90-day deadline expired. To excuse her delay, she relied on an exception based on changed country conditions that materially affect her eligibility for relief. 8 U.S.C. § 1229a(c)(7)(C)(ii); *Xiao Jun Liang v. Holder*, 626 F.3d 983, 987–88 (7th Cir. 2010). Any motion to reopen, regardless of timing, can be denied properly if: (1) it is not supported by previously unavailable and material evidence; (2) it fails to establish the applicant's prima facie eligibility for the underlying relief sought; or (3) the Board determines discretionary relief is not appropriate in the petitioner's case. *Mansour v. INS*, 230 F.3d 902, 907 (7th Cir. 2000). We review the Board's denial of a motion to reopen for an abuse of discretion. *Xiao Jun Liang*, 626 F.3d at 988. We will find an abuse of discretion and remand the denial of a motion to reopen if, among other things, the decision "was made without a rational explanation." *Mansour*, 230 F.3d at 907 (internal quotations omitted).

"In determining whether evidence accompanying a motion to reopen demonstrates a material change in country conditions that would justify reopening, we compare the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing below." *In re S-Y-G*, 24 I. & N. Dec. 247, 253 (BIA 2007). To constitute a change in country conditions, the conditions must have done more than simply worsen cumulatively. *Id*. That does not mean that the conditions before and after the motion to reopen will not be related or connected. Evaluating gradations of human misery can be a daunting task. Where significant human rights abuses previously existed, perhaps all changes could be understood as a cumulative worsening, but differences in degree matter. Some situations present conditions so grave that a new threshold has been met. Boika's new evidence, corroborated in substantial part by our own government's decision to impose new sanctions on Belarus in response to the new campaign to suppress political opposition after the 2010 elections, seems to meet this standard and deserves more attention than it has received thus far in this case.

Boika's motion to reopen included over one hundred pages showing that the treatment of the political opposition in Belarus had changed dramatically since the election of President Lukashenko in 2010, after her 2007 application for asylum had been denied. Credible international sources reported that the election was not fair and that the results were not reliable**.** *OSCE Observers Told to Leave Belarus Over Election Fraud Claims*, Associated Press, The Guardian, Dec. 31, 2010, available at http://www.guardian.co.uk/world/2010/dec/31/osce-leave-belarus-election-fraud-claims; Michael Schwirtz, *Belarus Police*

*Arrest Opposition Leaders*, N.Y. Times, Dec. 20, 2010, available at www.nytimes.com/2010/12/21/world/europe/21belarus.html?_r=0 (reporting that Western election observers on ground "highlighted apparent fraud"). In a December 20, 2010 statement, the White House said that the "United States cannot accept as legitimate the results of the presidential election announced by the Belarusian Central Election Commission." Orest Deychakiwsky et al., *Belarusian Regime Resolutely Dashes Any Hopes for Democratic Liberalization*, Commission on Security & Cooperation in Europe, U.S. Helsinki Commission, Jan. 6, 2011, available at http://www.csce.gov/index.cfm?FuseAction=ContentRecords.ViewDetail&ContentRecord_id=482&Region_id=0&Issue_id=0&ContentType=G&ContentRecordType=G&CFID=27057194&CFTOKEN=31349947 [hereinafter *Helsinki Commission*]. The White House also stated that the violence on election day represented "a clear step backwards on issues central to our relationship with Belarus." Michael Schwirtz, *Belarus Police Arrest Opposition Leaders*, N.Y. Times, Dec. 20, 2010, available at www.nytimes.com/2010/12/21/world/europe/21belarus.html?_r= 0.[1]

After the election, 40,000 opposition supporters rallied and called for President Lukashenko's resignation. The Helsinki Commission later explained that "the brutal and bloody election-night crackdown against political opposition supporters, including mass arrests of demonstrators, as well as candidates, who challenged the 16-year rule of Alexander Lukashenk[o], was *unprecedented*." Helsinki Commission (emphasis added).

---

[1] All websites cited in this opinion were last visited on August 16, 2013.

The violent crackdown on the political opposition after the 2010 presidential elections is the materially changed country condition that Boika relies upon to justify her motion to reopen. Human Rights Watch conducted an extensive investigation in February 2011 and concluded, in part, that the human rights abuses that occurred during and after the 2010 elections, "including abuse of detainees, trials behind closed doors and raids on human rights organizations," constituted a "serious deterioration in the already poor state of human rights in Belarus." Human Rights Watch, *Shattering Hopes*: *Post-Election Crackdown in Belarus*, at 1, March 2011, available at www.hrw.org/sites/default/files/reports/belarus0311Web.pdf.

The violence and oppression were not limited to election night. The Belarusian government continued rounding up and arresting opposition members at least six weeks after the elections. Michael Schwirtz, *U.S. and Europe Move Against Belarus's Leader*, N.Y. Times, Jan. 31, 2011, available at http://www.nytimes.com/2011/02/01/world/europe/01belaru s.html. Reports of this oppressive, anti-democratic behavior targeting opposition groups continued through June 2011, when Boika filed her motion to reopen. See Radio Free Europe, *Belarusian Police Disperse Opposition Flash Mob*, June 15, 2011, available at http://www.rferl.org/articleprintview/ 24236371.html; Aliaksandr Kudrytski & Emma O'Brien, *Police, Protesters Meet in Minsk Amid Warnings*, Bloomberg, June 16, 2011, available at http://democraticbelarus.eu/news/ police-protesters-meet-minsk-amid-warnings. The Belarusian government also shut down the internet and social networking sites, leaving independent media "on the verge of being wiped out," as reported by the Belarusian deputy chair of the non-

governmental Association of Journalists. Fred Weir, *Belarus Crackdown Strains Ties with both EU and Russia*, The Christian Science Monitor, Jan. 12, 2011, available at http://www.csmonitor.com/World/Europe/2011/0112/Belarus -crackdown-strains-ties-with-both-EU-and-Russia.

The clearest indication that conditions materially worsened in Belarus after the 2010 election came in the form of the United States and European Union reactions to the events. In February 2011, the United States and the European Union imposed sanctions on President Lukashenko and other Belarusian politicians, prohibiting them from entering the United States or the European Union and freezing all assets belonging to them in the United States and the European Union. Both the European Union and the United States had previously imposed some sanctions in 2006, but the European Union had lifted them. After the 2010 election, however, the European Union imposed sanctions on Belarus, while the United States greatly tightened the earlier sanctions. Michael Schwirtz, *U.S. and Europe Move Against Belarus's Leader*, N.Y. Times, Jan. 31, 2011, available at http://www.nytimes.com/2011/02/01/world/europe/01belaru s.html. The "new sanctions are more far-reaching than any imposed earlier, taking aim at many more officials." *Id.* The *New York Times* reported that the United States took this unprecedented action because President Lukashenko "began a campaign of repression that even seasoned opposition figures say has exceeded anything in the president's 16-year rule." *Id.*

II.  *Judicial Review of the Board's Decision*

  A.  *Changed Country Conditions*

The Board denied Boika's motion to reopen as untimely, finding that she did not qualify for the exception for materially changed country conditions. The Board's terse explanation said only that "the evidence proffered with the respondents' present motion does not reflect changed country conditions in Belarus that materially affect their eligibility for asylum, withholding of removal, and protection under the Convention Against Torture." That is the only sentence in the Board's dismissal that explains why the new evidence, including the United States and European Union sanctions after the 2010 elections and crackdown, did not suffice as changed country conditions that materially affected Boika's asylum claim.

"We have frequently remanded cases when the BIA's or the IJ's failure to discuss potentially meritorious arguments or evidence calls into question whether it adequately considered these arguments." *Kebe v. Gonzalez*, 473 F.3d 855, 857 (7th Cir. 2007) ("Although the BIA might have offered reasons for rejecting the evidence of changed conditions, or for denying relief despite changed conditions, the absence of any articulated reasons in the BIA's decision constitutes an abuse of discretion and requires a remand."); see also *Moosa v. Holder*, 644 F.3d 380, 386 (7th Cir. 2011) ("[W]e have consistently found an abuse of discretion where the Board ignores or misapplies an applicant's evidence.").

We have previously found that even more detailed Board decisions provided so little explanation that we could not properly exercise judicial review. In *Mekhael v. Mukasey*,

509 F.3d 326, 327 (7th Cir. 2007), for example, the Board denied the petitioner's motion to reopen the denial of his asylum application because the evidence presented merely "detail[ed] ongoing problems in Lebanon, and therefore, was discoverable and available" before the original asylum application and furthermore that "to the extent that any specific incidents alleged by the [petitioner] occurred after that time, they are merely cumulative, and as such, not persuasive." We found that the Board's explanation in that decision was insufficient to allow us to exercise our review appropriately. In reversing the Board, we said that "we have repeatedly reversed the Board when it has failed to give reasoned consideration to post-hearing evidence." *Id.* (collecting cases).

The same reasoning applies here to the Board's even more opaque conclusion denying Boika's motion to reopen. The Board did not appropriately explain why it rejected her evidence of changed country conditions. As in *Mekhael*, "[w]e take no position on the merits of the motion to reopen. The only ground of our decision is the Board's failure to articulate a reasoned response to the motion. We understand the Board's staggering workload. But the Department of Justice cannot be permitted to defeat judicial review by refusing to staff the Immigration Court and the Board of Immigration Appeals with enough judicial officers to provide reasoned decisions." *Id.* at 328.

B. *Prima Facie Claim for Asylum*

If Boika could not show a prima facie case for eligibility, then the Board's failure to provide a sufficient explanation of the denial would be harmless because reopening the case

would be futile. Boika's motion to reopen asserted that she could show a prima facie claim of asylum based in part on her membership in a political group suffering persecution in Belarus. See 8 C.F.R. § 1208.13(b)(2)(iii) (applicant can show well-founded fear of persecution by showing membership in group subject to pattern or practice of persecution).

An asylum application based on a well-founded fear of future persecution must demonstrate that the petitioner faces a "reasonable possibility of suffering such persecution if he or she were to return to that country," 8 C.F.R. § 1208.13 (b)(2)(i)(B), and the petitioner is "unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. § 1208.13(b)(2)(i)(C). A person has a well-founded fear of persecution if a reasonable person in the same position would fear persecution. *Jukic v. INS*, 40 F.3d 747, 749 (5th Cir. 1994). To show a prima facie case for eligibility for asylum, a petitioner must present "sufficient evidence to demonstrate a reasonable likelihood of success on the merits so as to make it worthwhile to develop the issues further at a full evidentiary hearing." *In re A-N & R-M-N*, 22 I. & N. Dec. 953, 956 (BIA 1999).

To demonstrate her current membership in the political opposition group being persecuted in Belarus, Boika presented her own testimony and an affidavit signed by the president of the Belarusian-American Association Inc., which advocates democratic rule in Belarus. The affidavit testified to Boika's frequent involvement and participation with the group since she has arrived in the United States. The organization holds rallies, protests, and other mass actions in opposition to President Lukashenko's regime. Boika testified to her regular

involvement and presented pictures of her active participation in the group protests and other events in New York. While the government questions the authenticity of these documents in its brief and at oral argument, the Board did not opine on the issue and therefore we do not either. Those are matters for a hearing on remand.

On the basis of this evidence as well as the new crackdown in Belarus itself, Boika argued that she had a reasonable fear of future persecution. She would be vulnerable to pattern and practice discrimination because she could, based on this new evidence, show her "inclusion in, and identification with, such group of persons such that [her] fear of persecution upon return is reasonable." See 8 C.F.R. § 1208.13(b)(2)(iii).

Regarding Boika's ability to establish a prima facie case for asylum eligibility in her motion to reopen, the Board's decision said a bit more but not enough to allow us to affirm it. The Board said that, "the submitted country information describing political conditions generally and episodes of human rights violations and violence against perceived political opponents in Belarus alone is insufficient to establish the respondents' *prima facie* eligibility for relief from removal." The Board then explained that the evidence of changed country conditions did not show that the Belarusian government is personally interested in Boika, so that she cannot establish a prima facie case.

This statement was not complete or correct. Boika does not have to show that she has been or will be personally targeted upon removal. Under section 1208.13(b)(2)(iii), she can also show a well-founded fear of persecution upon return to

Belarus by showing that she belongs to a group that is currently being persecuted. Boika offered evidence that she belonged to the opposition movement that has suffered severe human rights abuses since the 2010 election. The Board's opinion was silent on this point. Again, "we have consistently found an abuse of discretion where the Board ignores or misapplies an applicant's evidence." *Moosa,* 644 F.3d at 386. Here the Board's failure to acknowledge or comment on Boika's current involvement in the opposition movement in the United States was an abuse of discretion.

C.  *The Prior Adverse Credibility Finding*

The government also argues that the Board's lack of explanation was harmless because Boika's evidence of her political activity while in the United States cannot be credited. The theory is that the IJ's adverse credibility finding in rejecting her first application for asylum means that her evidence about her more recent and current political activity in the United States should not be believed. Boika's original application for asylum focused on the political oppression occurring before 2007. Her application detailed three incidents in which she claimed she was arrested and beaten badly enough to require medical attention, all because of her political participation in the opposition movement in Belarus. The application was denied, and the denial was affirmed by the Board despite the IJ's finding that "political persecution is a harsh reality in the present day Belarus," because the IJ made an adverse credibility determination regarding Boika's claimed political participation and resulting targeting, harassment, and abuse. In light of the deferential review we give to cogent credibility

findings, *e.g.*, *Hassan v. Holder*, 571 F.3d 631, 636–37 (7th Cir. 2009), we affirmed that denial.

We do not revisit the IJ's adverse credibility finding from that earlier proceeding. For present purposes, though, the critical point is that such adverse credibility findings do not necessarily discredit Boika's new evidence in her motion to reopen regarding and her claims of *current* political participation in the United States, for which she provided corroborating evidence. See *Gebreeyesus v. Gonzalez*, 482 F.3d 952, 955 (7th Cir. 2007). To the extent that this is what the Board meant when it said that Boika's previously discredited claims are "somewhat entwined in the respondents' present filing," that too would be an abuse of discretion, at least without further consideration of the new evidence.

We are not suggesting that the Board was required to forget the prior credibility finding, but the Board needed to engage with the new evidence. Moreover, the difficulties that aliens seeking asylum often face in obtaining corroborating evidence can sometimes mean that an earlier adverse finding may have been reasonable on the available record but wrong in an objective sense. Thus it would have been an abuse of discretion for the Board to rely only on the prior adverse credibility finding to discredit Boika's new evidence without a proper evidentiary hearing.

The government argues, however, that adverse credibility findings are cordoned off from future credibility determinations only when "the factual predicate of [the] claim of future persecution is independent of the testimony that the [Immigration Judge] found not to be credible." Gov. Br. at 27, quoting

*Paul v. Gonzales*, 444 F.3d 148, 154 (2d Cir. 2006). This argument is not persuasive.

The factual predicates are distinct here: Boika first claimed asylum based on her pre-2007 political activity in Belarus, which the IJ discredited. She now claims asylum based on her political activity in the United States — a claim that has not been and could not be discredited without an evidentiary hearing — as well as the crackdown in Belarus after the 2010 election. "Given these distinct facts, the prior adverse finding need not undermine [Boika's] theory of future persecution." *Gebreeyesus* 482 F.3d at 955. In *Gebreeyesus*, we granted review of denial of an alien's motion to reopen an asylum petition based on changed country conditions in a remarkably similar case from Ethiopia. We held that the IJ's earlier credibility finding against the alien did not excuse the Board from engaging with her new evidence concerning changes in country conditions and her political opposition activity in the United States.

Boika may "prevail on a theory of future persecution despite an IJ's adverse credibility ruling as to past persecution, so long as the factual predicate of [her] claim of future persecution is independent of the testimony that the IJ found not to be credible." *Id*. (internal quotations omitted). In *Gebreeyesus,* we were also troubled by the fact that "[t]he BIA's reliance on the prior adverse credibility finding is especially unsound because it ignored the facts in Worku's affidavit supporting her theory of future persecution." *Id*. at 955 n.3. The same concerns apply with equal force here.

Finally, the Government argues that the documents corroborating Boika's current political participation are not

credible because they lack proper authentication. This was not the Board's rationale, however, and for that reason alone we could reject the argument. *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). "The government's other *post hoc* rationales fall short for similar reasons … . The government's first theory—that the Board's adverse determination of [Boika's] credibility during [her political] persecution asylum claim 'carries over' to a later asylum claim based on distinct facts—has been expressly rejected by this court and others." *Ji Cheng Ni v. Holder*, 715 F.3d 620, 630 (7th Cir. 2013). Such a conclusion would almost certainly be an abuse of discretion if the petitioner were not afforded an evidentiary hearing first.

The Board therefore should have considered Boika's factually distinct claims of future persecution and could not properly reject them based solely on the past adverse credibility finding. The Board's silence on this point, combined with the failure to acknowledge or comment on Boika's supporting documentation, means the denial of her motion to reopen was an abuse of discretion.

The petition for review is GRANTED and the case is REMANDED to the Board of Immigration Appeals for further proceedings consistent with this opinion.