In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-1416

DUDI A. YAHYA,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III, Attorney General of the United States,

*Respondent*.

———————————

Petition for Review of an Order of the
Board of Immigration Appeals
No. A076-773-842.

———————————

SUBMITTED DECEMBER 12, 2017 — DECIDED MAY 3, 2018

———————————

Before BAUER, RIPPLE, and SYKES, *Circuit Judges*.

PER CURIAM. Dudi Yahya petitions for review of the denial of his motion to reopen removal proceedings that concluded more than fourteen years ago. The Board of Immigration Appeals ("Board") upheld the Immigration Judge's ("IJ") decision to deny his motion to reopen. The Board held that Mr. Yahya did not qualify for one of the exceptions to the

ninety-day limitation for the filing of a motion to reopen. Mr. Yahya now submits that the Board abused its discretion by rejecting his evidence of changed conditions in Indonesia. Because the Board permissibly concluded that Mr. Yahya did not meet his evidentiary burden, we deny the petition.

# I

## BACKGROUND

Mr. Yahya entered the United States on a six-month tourist visa in either 2000 or 2001 and overstayed.[1] According to Mr. Yahya, in March 2003, he voluntarily appeared to register in the Government's National Security Entry-Exit Registration System and then was placed in removal proceedings. One month later, he received a notice to appear, charging him as removable because he had overstayed his visa in violation of 8 U.S.C. § 1227(a)(1)(B). Five months later, he appeared before an IJ and accepted an order of voluntary departure, but he did not depart. According to Mr. Yahya, he remained in the United States because he did not want to put his eight-month-old, American-born son on a twenty-hour flight to Indonesia. "Before I knew it," he stated, "the days turned into months, and the months turned into years and … I have not departed."[2]

More than twelve years after his voluntary departure order, in 2016, Mr. Yahya moved to reopen his removal proceedings. Because the ninety-day deadline for filing motions

---

[1] A.R. at 81, 229.

[2] *Id*. at 81.

to reopen had passed, he sought to satisfy one of the exceptions to the time limit by raising a claim for asylum "based on changed country conditions arising in the country of nationality." 8 U.S.C. § 1229a(c)(7)(C)(i), (ii). Mr. Yahya said that he feared that his "moderate" Islamic faith would make him a target for "radical fundamentalist Islamic groups" in Indonesia.[3] To support this assertion, he submitted twenty news articles that, in his view, documented this threat.

The IJ denied the motion. He concluded that Mr. Yahya did not provide sufficient evidence of changed conditions. He further stated that, in any event, he would "deny reopening as a matter of discretion given the totality of the record."[4] He noted that the equities in Mr. Yahya's favor had to be balanced against the fact that they were acquired after he had agreed to depart the United States voluntarily and then had failed to do so.

Mr. Yahya appealed to the Board. He submitted that the IJ erred by rejecting his "abundant evidence showing that the presence of ISIS in Indonesia has resulted in changed country conditions for moderate, westernized Muslims like him and his family."[5]

The Board upheld the IJ's decision on the basis of the IJ's reasoning. It concluded that Mr. Yahya "ha[d] not carried his burden of establishing a material change in country condi-

---

[3] *Id.* at 63–65.

[4] *Id.* at 41.

[5] *Id.* at 19.

tions for moderate, or westernized, Muslims in Indonesia" between his last hearing in 2003 and his 2016 motion to reopen.[6] Taking administrative notice of the State Department's 2003 Country Report on Indonesia, the Board pointed out that "extremist Islamic groups existed in Indonesia at that time," and some of them had attacked and bombed civilians, but Mr. Yahya had expressed no fear of returning at that time.[7] The Board also underscored that at least two of Mr. Yahya's own submissions demonstrated that extremist violence was present earlier and is not tolerated by the Indonesian government.

## II
## DISCUSSION

Mr. Yahya now contends that the Board abused its discretion in denying his late motion to reopen. Specifically, he claims that his submissions demonstrated rising levels of violence since his 2003 voluntary departure order and that the Board erred in concluding that the increase did not amount to changed country conditions. He highlights various excerpts from his submissions that, he asserts, show increased levels of violence against moderate Muslims by ISIS and the Islamic Defenders Front, an Indonesian terrorist group seeking to establish Sharia law in Indonesia. He contends that the Board overlooked these worsening conditions of violence directed at moderate Indonesian Muslims and failed to recognize that

---

[6] *Id.* at 3–4.

[7] *Id.* at 4.

the State Department's 2003 report on Indonesia "is silent as to violence against moderate Muslims."[8]

We begin by placing Mr. Yahya's claims in the appropriate legal framework. Mr. Yahya sought reopening of an order to voluntarily depart the United States entered approximately thirteen years before his motion was filed. Reopening is generally available for such orders in removal proceedings, *see* 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(c), but is subject to a ninety-day deadline. The deadline does not apply, however, where the alien seeks "[t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii); *see also* 8 U.S.C. § 1229a(c)(7)(C)(ii). In addition, the alien must establish prima facie eligibility for the relief sought. *INS v. Abudu*, 485 U.S. 94, 104 (1988). "Any motion to reopen, regardless of timing, can be denied properly if: (1) it is not supported by previously unavailable and material evidence; (2) it fails to establish the applicant's prima facie eligibility for the underlying relief sought; or (3) the Board determines discretionary relief is not appropriate in the petitioner's case." *Boika v. Holder*, 727 F.3d 735, 738 (7th Cir. 2013).

With respect to changed circumstances specifically, we have stated that "[t]he only requirements are (1) that there be changed circumstances, (2) that the circumstances be material and (3) that the evidence showing changed circumstances

---

[8] Pet'r's Br. 18.

'was not available and could not have been discovered or presented at the previous hearing.'" *Joseph v. Holder*, 579 F.3d 827, 833–34 (7th Cir. 2009) (quoting 8 C.F.R. § 1003.2(c)(3)(ii)). We specifically have rejected any higher burden, such as a "dramatic change" standard, *id.* at 833, and we have noted that a "changed circumstance need not reach the level of a broad social or political change in a country; a personal or local change might suffice," *Lin Xing Jiang v. Holder*, 639 F.3d 751, 756 (7th Cir. 2011).[9]

On the question whether the evidence establishes changed country conditions, the Board compared objective evidence of the state of religious violence in Indonesia from 2003, the time of Mr. Yahya's original proceedings, to the evidence he presented now. We have approved expressly of this methodology. In describing the threshold, we have stated:

> To constitute a change in country conditions, the conditions must have done more than simply worsen cumulatively. That does not mean that the conditions before and after the motion to reopen will not be related or connected. Evaluating gradations of human misery can be a daunting task. Where significant human rights abuses previously existed, perhaps

---

[9] We have not allowed, however, claims to be made on the basis of changes to an alien's personal circumstances in the United States after a prior removal order. *Cheng Chen v. Gonzales*, 498 F.3d 758, 760 (7th Cir. 2007) (affirming denial of motion to reopen where alien's one-child-policy asylum claim was based on post-removal order children born in the United States). To the extent, therefore, that Mr. Yahya's fears are based on his longterm residence in the United States, following an order to depart, the Board was permitted to give them little weight.

> all changes could be understood as a cumulative worsening, but differences in degree matter. Some situations present conditions so grave that a new threshold has been met.

*Boika*, 727 F.3d at 739 (internal citation omitted). We found that threshold met where, in *Boika*, the alien's evidence showed well documented and specific new threats to the political opposition following an election in Belarus.

Here, by contrast, although Mr. Yahya has submitted a significant number of articles, few of them bear directly on the potential harm he would face on return. Many are concerned specifically with the threats to Christian communities throughout the world, the growth of ISIS generally and its worldwide aims, or the rise of ISIS recruiting in Indonesia. Few touch on the harms present for moderate Muslims. His evidence mentions only one ISIS attack in Indonesia and does not show that the attack targeted moderate Muslims. He has evidence of only one attack against moderate Muslims between 2003 and 2016—the 2012 attack against a Canadian feminist Muslim author, which is not sufficient to show a material change in country conditions. His submissions also provide almost no evidence about the threat of terrorism against moderate Muslims in Indonesia during 2003. He therefore does not provide a "baseline" against which to measure a change in country conditions. *Moosa v. Holder*, 644 F.3d 380, 386 (7th Cir. 2011).[10]

---

[10] Mr. Yahya also faults the Board for conflating the extremist groups operating in Indonesia in 2003 with those operating now. The Board's analysis, fairly read, is that Islamic extremist groups existed in 2003 and exist now, and that Mr. Yahya's evidence as a whole does not show a material

Accordingly, the evidence he submitted does not show a fundamental shift in the safety and security of his country for the moderate Muslim population. Whatever changes have come to Indonesia since 2003 with respect to violent extremist groups, Mr. Yahya has failed to establish that the changes were material to him and to the asylum claim he now wishes to present. The Board was entitled to conclude that this evidence does not demonstrate "a new threshold" of radical Islamic terrorism in Indonesia in 2016. *Boika*, 727 F.3d at 739.

## Conclusion

Because the Board permissibly concluded that Mr. Yahya's submissions do not demonstrate materially changed conditions in Indonesia between 2003 and 2016, we DENY the petition.

---

change in conditions such that he is now more at risk. On this record, that conclusion was supported by substantial evidence.