In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-1892

MERIYU,

*Petitioner*,

*v.*

WILLIAM P. BARR, Attorney General
of the United States,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A079-319-281

_____

ARGUED DECEMBER 17, 2019 — DECIDED FEBRUARY 26, 2020

_____

Before RIPPLE, SYKES, and ST. EVE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Meriyu, an Indonesian citizen who is of Chinese descent and of the Buddhist faith, petitions for review of the denial of her motion to reopen removal proceedings that concluded more than fourteen years ago. In 2002, Ms. Meriyu sought relief based on fear of persecution on account of race and religion but was ordered removed after she failed to appear at a hearing before an immigration

judge. Fourteen years later, she moved to reopen the proceedings. The Board of Immigration Appeals ("the Board") upheld an IJ's ruling that the motion was untimely and that she could not show a material change in country conditions since the hearing. She subsequently filed two motions to reopen that were denied for similar reasons. In this petition for review, Ms. Meriyu challenges the denial of her most recent motion to reopen. The Board did not abuse its discretion in denying her motion, and we therefore deny her petition for review.

## I.

### BACKGROUND

Ms. Meriyu, now forty-nine years old, testified that she experienced mistreatment because of her Chinese ethnicity and Buddhist faith while growing up in Indonesia. In high school, she once was taunted on her walk to a bus stop, held up at knifepoint, and then sexually molested. She recalled being subjected to discrimination at local temples during Chinese New Year festivities, when Indonesian Muslims would "extort money" from Chinese Buddhists and "threaten us."[1] In May 1998, when large-scale riots erupted across the country (eventually leading to the resignation of President Suharto and the fall of the New Order government), her brother's shop and her aunt's home were looted and burned, and her sister's home was vandalized. She says that the violence prompted her to leave Indonesia, and in 2000 she came to the United States on a six-month nonimmigrant visa. She overstayed.

---

[1] Admin. R. at 310.

Since coming to the United States, Ms. Meriyu has taken care of her mother, who died in 2005; married; and raised a child, who is now twelve years old. In 2001, Ms. Meriyu applied for asylum. In 2002, she was served with a Notice to Appear charging her with removability under 8 U.S.C. § 1227(a)(1)(B), as an alien who remained longer than permitted after admission. At a removal hearing, Ms. Meriyu conceded removability but requested asylum and withholding of removal. Her hearing before an immigration judge was scheduled for June 2003, but she failed to appear and was ordered removed in absentia. Her attorney at the time moved to withdraw, and Ms. Meriyu's application was denied for lack of prosecution.

In September 2003, Ms. Meriyu moved to reopen her case, alleging that she did not appear at her hearing because she had been in an accident three days earlier and sustained injuries to her ankle and foot. The IJ denied the motion because she had not met her burden of establishing that her injuries constituted exceptional circumstances excusing her failure to appear for her removal hearing. The IJ added that Ms. Meriyu had not complied with the requirements set forth in *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988), to establish ineffective assistance of counsel.

Fourteen years later, in late 2017, Ms. Meriyu moved again to reopen her case, arguing that the previous IJ had ignored the medical evidence of her injuries and that country conditions in Indonesia had materially changed. She attached five publications describing the treatment of ethnic Chinese in Indonesia, three of which discussed the indictment and subsequent conviction of former Jakarta governor Basuki Tjahaja Purnama, a Christian of Chinese descent

known as "Ahok," who was sentenced to prison earlier in 2017 on blasphemy charges after a politically motivated smear campaign. The IJ denied her motion, explaining, first, that she was not entitled to equitable tolling (because she had not introduced corroborative evidence of her foot injuries, for instance), and, second, that she had not shown that conditions in Indonesia had materially changed (because her evidence reflected only "ongoing discrimination and mistreatment" by certain segments of society).[2]

Ms. Meriyu appealed, and the Board upheld the IJ's decision. The Board explained that her motion to reopen was untimely, having been filed more than fourteen years after entry of the final administrative removal order; that Ms. Meriyu failed to show that she exercised due diligence to equitably toll the ninety-day filing deadline for motions to reopen; and that she had not established that conditions in Indonesia had materially changed since her 2003 hearing. The Board concurred in the IJ's findings that the record evidence showed that the ongoing discrimination and mistreatment by some segments of Indonesian society were "similar and not materially different" from the conditions alleged by Ms. Meriyu in her asylum application.[3]

In November 2018, Ms. Meriyu filed a motion to reopen and reconsider with the Board, insisting that conditions in Indonesia had changed materially since 2003. Around 2003, she noted, Indonesia had been promoting racial and ethnic tolerance, loosening its policy towards minorities, and even inviting them to participate in politics. By 2017, however,

---

[2] *Id.* at 131.

[3] *Id.* at 27.

ethnicity and religion "came to the fore again": Intolerant groups protested the governorship of the Chinese Christian politician Ahok, who later was imprisoned on charges of blasphemy.[4]

In April 2019, the Board denied her motion, reiterating that the motion to reopen was untimely and that the doctrine of equitable tolling did not apply. The Board also stood by its prior finding that Ms. Meriyu had not established that conditions had materially changed for ethnic Chinese and Buddhist minorities in Indonesia.

## II.

## DISCUSSION

Our review is limited to the Board's April 2019 denial of Ms. Meriyu's motion to reopen and reconsider. Generally, an alien may file only one motion to reopen and that motion must be filed within ninety days of the final administrative order of removal. *See* 8 U.S.C. § 1229a(c)(7)(A) & (C); 8 C.F.R. § 1003.2(c). Because Ms. Meriyu did not file her motion to reopen until 2017, some fourteen years after the filing deadline, she may reopen her case only if she shows material evidence of changed country conditions in Indonesia. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); *see also* 8 C.F.R. § 1003.2(c)(3)(ii). The deadline does not apply if the motion is based on changed country conditions, as long as the supporting evidence is material, and was not previously available and could not have been discovered or presented at the prior hearing. 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii); *see Joseph v. Holder*, 579 F.3d 827, 833–34 (7th

---

[4] *Id*. at 16.

Cir. 2009). Changed country conditions must reflect more than a "cumulative worsening" of circumstances. *Boika v. Holder*, 727 F.3d 735, 739 (7th Cir. 2013). However, they "need not reach the level of a broad social or political change in a country; a personal or local change might suffice." *Lin Xing Jiang v. Holder*, 639 F.3d 751, 756 (7th Cir. 2011). We review the denial of the motion to reopen for an abuse of discretion. *Boika*, 727 F.3d at 738.

Ms. Meriyu first challenges the Board's determination that her evidence showed mistreatment that was merely on-going rather than suggestive of a material change. She argues that the Board overlooked the "growing pattern" of increased enforcement of Indonesia's blasphemy laws and the "threat such laws pose to religious minorities."[5]

Because Ms. Meriyu seeks to overturn the denial of her motion to reconsider, she must "identif[y] specific factual or legal errors in [the Board's] prior ruling." *Shaohua He v. Holder*, 781 F.3d 880, 882 (7th Cir. 2015) (internal quotation marks omitted). Where a petitioner raises "potentially meritorious arguments," the Board must consider those arguments, and we have "frequently remanded cases" where the Board failed to do so. *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007).

Its assessment may have been sparse, but the Board was not required to give an "exegesis on every contention," *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (internal quotation marks omitted). What it did say was sufficient to address the scant evidence that Ms. Meriyu put into the record. In its order of April 10, 2019, the Board addressed

---

[5] Appellant's Br. 9.

Ms. Meriyu's contention that the record evidence showed there had been an "end to the long-established hostility against minorities" around the time of her 2003 hearing.[6] The Board concluded that this claim was "not otherwise borne out by the evidence in the record."[7] It determined that the record did not reflect materially changed country conditions. Some of the reports Ms. Meriyu submitted described adverse conditions (including racially-tinged protests of an ethnic Chinese Christian governor), but others chronicled improvement (especially in the conditions for ethnic Chinese in the decade after Suharto's fall). In light of the paucity of her evidence, the Board's conclusion that country conditions had not materially changed was not unreasonable.

Ms. Meriyu next contends that the Board erred by failing to take administrative notice of the U.S. Department of State country reports, which, she submits, confirm that the Indonesian government's increased enforcement of blasphemy laws was "fuel[ing] discrimination and abuse against religious minorities."[8] Specifically, Ms. Meriyu argues that the Board underappreciated the significance of not only the conviction of the Chinese Christian politician Ahok but also the conviction of an ethnic Chinese woman from Ms. Meriyu's home city who was sentenced to eighteen months in prison after she asked a mosque to lower the volume of its loudspeakers.

---

[6] Admin. R. at 8 (internal quotation marks omitted).

[7] *Id.* at 8.

[8] Appellant's Br. 10.

Even though the Board may take administrative notice of the country reports not considered by the IJ, no regulation or court decision requires the Board to do so. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (providing that the Board may not engage in factfinding but *may* take administrative notice of commonly known facts including current events or the contents of official documents); *Meghani v. INS*, 236 F.3d 843, 848 (7th Cir. 2001) (explaining that the Board is not required to take judicial notice sua sponte of new country reports). That is not to say that the Board can simply ignore current developments. We may take judicial notice of more recent country reports, even where the Board does not do so. *Lin Xing Jiang*, 639 F.3d at 756 n.2. Country reports may sometimes be the "best source of information" about conditions in a country, *Ping Zheng v. Holder*, 701 F.3d 237, 242 (7th Cir. 2012) (internal quotation marks omitted), but their generalized nature often limits their discussion of more specific or local problems, *Gomes v. Gonzales*, 473 F.3d 746, 756 (7th Cir. 2007); *see also* U.S. Dep't of Justice, *Country Conditions Research*, https://www.justice.gov/ eoir/country-conditions-research (last visited Feb. 21, 2020) (explaining that country reports are not necessarily exhaustive and are not meant to be conclusive in asylum cases).

The country reports that Ms. Meriyu cites do not cause us to question the Board's conclusion that conditions in Indonesia had not materially changed. Foremost, conditions in Indonesia in 2003 were worse than Ms. Meriyu suggests. In her telling, conditions in 2003 marked "the end in the long-established hostility against the minorities," yet by 2017, ethnic tensions had spiked, as illustrated by Ahok's convic-

tion.[9] This version, however, is not supported by the U.S. Department of State reports from 2003 to 2018. These reports describe continuing violence throughout 2003. According to the report from 2003, "[t]errorists, civilians, and armed groups also committed serious human rights abuses during the year, and the Government was in some cases unable or unwilling to prevent these abuses." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Indonesia: Country Reports on Human Rights Practices – 2003, 2 (Feb. 25, 2004). The report explains that the 1998 riots may have ended by 2003, but the government still had "failed to make progress in establishing accountability for the … riots, which included acts of torture and other attacks against Chinese Indonesian women in Jakarta and other cities." *Id.* at 8.

The United States also publishes reports specifically addressing issues of religious freedom. Although there was no U.S. Department of State International Religious Freedom Report available for the year 2003, the reports from around that period—2000 and 2004—reflect that it was a violent time in Indonesia, not a harbinger of peace. The 2000 report detailed religious violence and ineffective government response. According to the 2004 report, terrorist attacks persisted through 2003, and "[t]he Government failed to hold accountable some religious extremists." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Indonesia: International Religious Freedom Report 2004, 1 (Aug. 15, 2005).

When compared to the 2003 conditions described in the State Department reports, current conditions in Indonesia do not reflect any "new threshold" of human rights abuses. *Boi-*

---

[9] Admin. R. at 16.

*ka*, 727 F.3d at 739. The U.S. Department of State Country Reports on Human Rights Practices and International Religious Freedom for the years 2016 through 2018 do not undermine the Board's determination that conditions have not materially changed. Moreover, our independent review of the State Department's Human Rights and Religious Freedom reports from 2016 to 2018 turned up only occasional references to violence toward ethnic Chinese and Buddhists, and none that could be characterized as persecution.

Finally, Ms. Meriyu argues that the Board's conclusion is at odds with decisions from other circuits that have found a material change in conditions for religious minorities in Indonesia. She points first to *Liem v. Att'y Gen.*, 921 F.3d 388 (3d Cir. 2019), in which the Third Circuit remanded the case because the Board failed to consider extensive evidence of worsening conditions for Indonesian Christians. But *Liem* does not help Ms. Meriyu because it focused on the visibility of the petitioner's religious practices and threats of violence that were particular to Christians, not necessarily other minorities. The Third Circuit pointed to Mr. Liem's role as a deacon to conclude that "the increase in religious intolerance in Indonesia reflected in the record might be uniquely problematic for Liem, since he is a minister in his community, thus practicing his Christian faith publicly." *Id*. at 400 (quotation marks omitted). Further, Mr. Liem introduced substantially more evidence than Ms. Meriyu: He submitted approximately 190 pages of evidence. *Id.* at 391 n.4.

Ms. Meriyu next invokes *Sihotang v. Sessions*, 900 F.3d 46, 53 (1st Cir. 2018), in which the First Circuit remanded the case for consideration of evidence of an "especially sharp increase in governmental and private persecution of Indone-

sian Christians between 2014 and 2017." *Sihotang*, however, is distinguishable because it involved evangelical Christians, "for whom public proselytizing is a religious obligation." *Id*. at 50. *Sihotang* turned on evidence of detailed descriptions of violence towards Christians, including instances in which the local government supported extremists in blocking Christians from attending Easter Mass and clergymen were stabbed in "broad daylight." *Id*. at 51.

Ms. Meriyu's third example is *Salim v. Lynch*, 831 F.3d 1133 (9th Cir. 2016), in which the Ninth Circuit remanded the case for consideration of evidence that Islamic extremist movements had targeted Indonesian Christians and that current conditions had changed from conditions at the time of the petitioner's previous hearing. *Salim* is distinguishable, however, because the Ninth Circuit explicitly restricted its discussion to Indonesian Christians when determining that Mr. Salim's conversion from Buddhism to Catholicism placed him at risk for persecution he would not have faced had he not converted. *Id*. at 1137–38. In the view of the Ninth Circuit, Mr. Salim—as a Christian—belonged to "the group whose religious freedoms have been violated the most." *Id.* at 1138 (internal quotation marks omitted). Mr. Salim also submitted evidence that changed circumstances would affect him personally, including a letter from his sister describing "the growing threat of violence and lack of protection from local police." *Id.*

Ms. Meriyu's circumstances more closely resemble those in *Yahya v. Sessions*, 889 F.3d 392 (7th Cir. 2018), where we affirmed a determination by the Board that conditions had not materially changed for moderate Muslims. Our reasoning in *Yahya* closely tracks the Board's orders in this case. There, as

here, the applicant presented sparse evidence of violence and "almost no evidence" about the threat the applicant would have faced in 2003, at the time of Mr. Yahya's original proceedings. *Id.* at 396. Just as Mr. Yahya's evidence of mistreatment of Christians did not "bear directly on the potential harm he would face on return," *id.*, Ms. Meriyu's evidence of Ahok's conviction—as the Board determined—did not suggest any prospect of persecution if she returned to Indonesia.

## Conclusion

Because the Board permissibly concluded that Ms. Meriyu did not demonstrate that conditions in Indonesia had materially changed between 2003 and 2017, the Board did not abuse its discretion in denying her petition to reopen removal proceedings. Accordingly, we deny the petition for review.

PETITION DENIED